[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

OMNI MEDSCI, INC.,

*Plaintiff*,

v.

OURA HEALTH OY,

*Defendant*.

Civil No. No. 2:26-cv-00289-JRG-RSP

**JURY TRIAL DEMANDED**

[redacted]

# OURA HEALTH OY'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

[redacted]

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ........ 2

III. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT ........ 4

IV. LEGAL STANDARD ........ 5

A. Every Asserted Claim Limitation Must Be Addressed with Respect to Each Accused Product ........ 5

B. Expert Conclusions Unsupported by Evidence do not Create a Dispute of Material Fact . 6

C. "Use" of a System Claim Under Section 271(a) ........ 6

V. ARGUMENT ........ 7

A. Summary Judgment of Non-Infringement Should Be Granted for Claims Where Dr. Daft Did Not Address Claim Limitations ........ 7

1. ...Dr. Daft does not analyze the "wherein the output signal is indicative of the one or more physiological parameters" requirement of Claims 1 and 5–7 of the '475 Patent 7

2. ... Dr. Daft does not analyze the "blood flow measurement" requirement of Claims 1 and 5–7 of the '475 Patent ........ 8

3. Dr. Daft does not analyze the full "third output signal" requirement of Claims 8 and 11–13 of the '475 Patent ........ 10

4. ..Dr. Daft does not analyze the "status of the user" requirement of Claims 7 and 9 of the '868 Patent ........ 11

5. ................Dr. Daft does not analyze the "configured to apply a threshold function to a comparison with a stored data set" requirement of Claims 12 and 13 of the '304 Patent ........ 13

B. Summary Judgment of Non-Infringement Should Be Granted for Specific Products Unaddressed by Dr. Daft with Regard to Claims 7 and 9 of the '868 Patent ........ 15

C. Summary Judgment of Non-Infringement Should Be Granted Where the Accused Oura Products Plainly Do Not Meet Claim Limitations ........ 15

1. The Oura Ring Generation 3 does not [redacted] as required by Claims 1, 5–8, and 11–13 of the '475 Patent ........ 16

2. ..The Oura Ring Generation 3 does not have six LEDs as required by Claim 6 of the '475 Patent ........ 19

3. ...... No Oura ring contains "a plurality of lenses" as required by Claim 12 of the '533 Patent ........ 20

D. Summary Judgment of No Direct Infringement of the '868, '533, and '304 Patents Should Be Granted ........ 22

1. .There can be no direct infringement by end users of the "Oura System" because the Oura Cloud [redacted] and not controlled by end users ........ 23

[redacted]

2. .... Dr. Daft did not link any alleged employee testing to the use of the entire claimed systems of the '868, '533, and '304 Patents ........ 24

VI. CONCLUSION ........ 26

[redacted]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptix, Inc. v. AT&T, Inc., et. al.*,
No. 6-12-cv-00017-MHS-CMC, Dkt. 392 (E.D. Tex. Sep. 29, 2015) ............................5, 7, 13

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*,
631 F.3d 1279 (Fed. Cir. 2011)..........................................................................................6, 23

*Cummins-Allison Corp. v. Glory Ltd.*,
No. 2:03-CV-358, 2005 WL 3408029 (E.D. Tex. Dec. 12, 2005) .....................................5, 21

*Intellectual Science and Technology, Inc. v. Sony Electronics, Inc.*,
589 F.3d 1179 (Fed. Cir. 2009).......................................................................................... *passim*

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005)..........................................................................................6, 15

*Laitram Corp. v. Rexnord, Inc.*,
939 F.2d 1533 (Fed. Cir. 1991)...................................................................................5, 7, 9, 15

*PC Connector Solutions LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005)..........................................................................................5, 21

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001).......................................................................................... *passim*

**Statutes**

35 U.S.C. § 271(a) ..........................................................................................................6, 22, 23

[redacted]

# I. INTRODUCTION

Defendant Oura Health Oy ("Oura") respectfully moves for summary judgment of non-infringement of various asserted claims of U.S. Patent Nos. 12,268,475 ("the '475 Patent") (attached as Ex. 1)[1]; 9,055,868 ("the '868 Patent") (attached as Ex. 2); 9,651,533 ("the '533 Patent") (attached as Ex. 3); and 10,874,304 ("the '304 Patent") (attached as Ex. 4) (collectively, "the Asserted Patents"). This Motion presents four independent grounds for summary judgment.

***First***, Oura moves for summary judgment of noninfringement with regard to those claim limitations that have been entirely unaddressed in the expert infringement report of Dr. Christopher Daft, Plaintiff Omni MedSci, Inc.'s ("Omni") technical expert. Where a plaintiff's expert does not offer an opinion regarding all elements of a claim, the plaintiff cannot carry its burden of proof to show infringement of that claim.

***Second***, Oura moves for summary judgment of noninfringement with respect to specific accused Oura products that Dr. Daft does not analyzed *at all* for certain asserted claims of the Asserted Patents. Omni cannot carry its burden of proof to show infringement of those claims by the Oura Gen 2 and Gen 3 products where Omni, including its expert Dr. Daft, has only addressed alleged infringement of the Oura Gen 4 product.

***Third***, Oura moves for summary judgment of noninfringement where Dr. Daft's opinions disregard the undisputed properties of the accused devices. An expert's conclusion that a claim limitation has been satisfied by a particular product or products does not create a dispute of material fact if that expert's opinions are plainly controverted by the evidence relied upon by that expert.

***Fourth***, Oura moves for summary judgment of no direct infringement according to the theories put forth by Omni and Dr. Daft concerning alleged direct infringement of the '868 Patent,

[1] All references to "Ex. __" refer to exhibits to the Declaration of Amanda E. Stephenson, submitted concurrently herewith.

[redacted]

the ’533 Patent, and the ’304 Patent (collectively, the “System Patents”), which require more than a sensing device to meet their claim language and cannot be directly infringed by sales of the Oura rings. Both of Omni’s theories of direct infringement of the System Patents—usage by end users, and testing by Oura employees—have critical deficiencies and thus fail as a matter of law.

For each of these independent reasons, the undisputed facts establish that no reasonable jury could find infringement, and summary judgment should be granted.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Oura has made four generations of ring products, which are referred to as the Oura Gen 1 to Gen 4 products. Ex. 5 (Oura’s Supplemental Objections and Responses to Omni's First Set of Interrogatories, dated March 30, 2026), at 7-8 (Oura’s Response to Interrogatory No. 1).




Ex. 6, OURA_0058404 at 409

The Oura Gen 1 was sold from March 2015, the Oura Gen 2 was sold from October 2018, the Oura Gen 3 was sold from October 2021, and the Oura Gen 4 was sold from October 2024. Ex. 5, at 7-8.

In this matter, Omni initially accused Oura Ring Oura Gens 1-4 (collectively, “the Accused Products”) of infringing Claims 1, 5-8, and 11-13 of the ’475 Patent; Claims 7 and 9 of the ’868 Patent; Claims 11 and 12 of the ’533 Patent; and Claims 12 and 13 of the ’304 Patent. *See* Dkt. 3,

[redacted]

¶¶ 74, 78, 89, 101. However, Omni has since confirmed that it is no longer pursuing the following infringement claims against Oura:

- Claim 11 of the ’533 Patent by all Oura Ring products
- Claims 1, 5–8, and 11–13 of the ’475 Patent by the Oura Ring Generations 1 and 2
- Claims 7 and 9 of the ’868 Patent by the Oura Ring Generation 1
- Claims 11 and 12 of the ’533 Patent by the Oura Ring Generations 1–3
- Claims 12 and 13 of the ’304 Patent by the Oura Ring Generations 1 and 2
- Claim 13 of the ’304 Patent for the Oura Ring Generation 3.

Ex. 7 (Werber Email Correspondence dated May 13, 2026) at 1.

Certain properties of the Oura Gen 3 and Gen 4 products are relevant to this motion. The Oura Gen 3 includes [redacted]. Ex. 8, OURA_0003395 at 413-414; Ex. 9, OURA_0000022. The Gen 3 uses [redacted] Ex. 10, OURA_0013085 at 3106. More specifically, [redacted] Ex. 11, OURA_0418939 at 943. [redacted]. *Id.* [redacted]. *See* Ex. 12 (Corrected Opening Expert Report of Dr. Christopher Daft, dated April 23, 2026), ¶ 479.

Other functionality related to Omni’s infringement theories has key attributes. The Oura cloud is operated by [redacted] and is located in [redacted]. Ex. 13 (Deposition Transcript of Ketan Patel), at 40:8-16, 153:7-13, 162:2-25. Oura’s Chronotype function provides a user an indication of whether they are “a morning person, a night person, or somewhere in between [and] Oura divides chronotypes into six types.” Ex. 14, OURA_0421410 at 411-413. Oura’s chronotype assessment is based upon [redacted]. Ex. 13 (Patel Tr.), at 22:8-22; Ex. 15 (Declaration of Ketan Patel),

¶¶ 8-9; Ex. 14, at OURA_0421411-413; *see also* Ex. 16 (Rebuttal Expert Report of Dr. Sarrafzadeh), ¶ 136. Oura's VO2 Max function assesses "the maximum amount of oxygen an individual can utilize during intense, exhaustive exercise." Ex. 17 OURA_0421414, at 414.

In support of its infringement allegations, Omni served the expert report of Dr. Christopher Daft ("Daft Rep.") on April 6, 2026, and served a "corrected" version on April 23, 2026. *See* Ex. 12. Omni has served no other expert report regarding alleged infringement by Oura. Oura served its rebuttal expert report of Dr. Majid Sarrafzadeh ("Sarrafzadeh Rep.") on April 27, 2026. *See* Ex. 16.

## III. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

Oura respectfully asks the Court to decide the following issues:

1. Whether summary judgment of non-infringement should be granted for those claims for which Dr. Daft did not address one or more required claim limitations, namely Claims 1, 5–8, and 11-13 of the '475 Patent, Claims 7 and 9 of the '868 Patent, and Claims 12 and 13 of the '304 Patent.

2. Whether summary judgment of non-infringement should be granted for Accused Products left unaddressed by Dr. Daft with respect to Claims 7 and 9 of the '868 Patent.

3. Whether summary judgment of non-infringement of Claims 1, 5–8, and 11–13 of the '475 Patent by the Oura Gen 3 ring should be granted due to [redacted].

4. Whether summary judgment of non-infringement of Claim 6 of the '475 Patent by the Oura Gen 3 ring should be granted due to it having [redacted].

5. Whether summary judgment of non-infringement of Claim 12 of the '533 Patent by all Oura products should be granted due to each product having [redacted].

[redacted]

6. Whether summary judgment of no direct infringement of the ’868, ’533, and ’304 Patents by end user use of Oura rings should be granted due to alleged end users not controlling the Oura Cloud that is located in [redacted]

7. Whether summary judgment of no direct infringement of the ’868, ’533, and ’304 Patents by Oura’s employee testing should be granted where Dr. Daft has failed to link any alleged employee testing to the use of the entire claimed systems.

## IV. LEGAL STANDARD

### A. Every Asserted Claim Limitation Must Be Addressed with Respect to Each Accused Product

To prove patent infringement, a patentee must establish by a preponderance of the evidence that the accused product meets each and every limitation of an asserted claim. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). Accordingly, “the absence of a single claim limitation from the accused product precludes literal infringement.” *Cummins-Allison Corp. v. Glory Ltd.*, No. 2:03-CV-358, 2005 WL 3408029, at *2 (E.D. Tex. Dec. 12, 2005) (citing *Wolverine World Wide Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196 (Fed. Cir. 1994)). “Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents.” *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001) (“Summary judgment of noninfringement is appropriate where the patent owner’s proof is deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial.”).

Where Plaintiff’s expert has failed to address an infringement issue, attorney argument alone “is not enough to defeat [a defendant’s] summary judgment motion.” *Adaptix, Inc. v. AT&T,*

[redacted]

*Inc., et. al.*, No. 6-12-cv-00017-MHS-CMC, Dkt. 392 at 8-9 (E.D. Tex. Sep. 29, 2015). Thus, to survive summary judgment on noninfringement, Plaintiff's expert "must specifically identify the infringing features of [the accused] components and the reason that one of skill in the art would recognize them as infringing." *Intellectual Science and Technology, Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1184-87 (Fed. Cir. 2009) (noting that the expert's citation to a schematic in a technical document without "pinpoint[ing] where [the infringing] elements are found in the accused devices" is insufficient to raise a genuine issue of material fact).

**B. Expert Conclusions Unsupported by Evidence do not Create a Dispute of Material Fact**

Where an expert opinion is unsupported by evidence, a mere conclusion of infringement does not preclude summary judgment. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) ("A party does not manufacture more than a merely colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion.").

**C. "Use" of a System Claim Under Section 271(a)**

Direct infringement of a system claim may occur by "us[ing]... any patented invention, within the United States." 35 U.S.C. § 271(a). "[D]irect infringement by 'use' of a system claim 'requires a party . . . to use each and every . . . element of a claimed [system].'" *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). "To 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it." *Id.*

[redacted]

## V. ARGUMENT

### A. Summary Judgment of Non-Infringement Should Be Granted for Claims Where Dr. Daft Did Not Address Claim Limitations

It is well established that infringement requires an accused product or system to meet each and every limitation of an asserted claim. Omni bears that burden, yet Dr. Daft does not address all claim language for all asserted claims. In one instance, he does not acknowledge the claim language in at all. In others, he recites claim language and states a conclusion, but does not analyze the actual requirements of the limitation. For those claims, Omni cannot create a genuine dispute of material fact, and summary judgment should be granted. *See Telemac*, 247 F.3d at 1323 (Fed. Cir. 2001) ("Summary judgment of noninfringement is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial."); *Adaptix*, No. 6-12-cv-00017, Dkt. 392 at 8-9 (attorney argument "is not enough to defeat [a defendant's] summary judgment motion."). Otherwise, Omni would be permitted to proceed to trial despite having no expert analysis on required claim elements, leaving attorney argument to fill gaps that the law does not permit.

#### 1. Dr. Daft does not analyze the "wherein the output signal is indicative of the one or more physiological parameters" requirement of Claims 1 and 5–7 of the '475 Patent

Omni has accused all Oura products of infringing Claims 1 and 5–7 of the '475 Patent, although Omni's contentions have since been narrowed to the Oura Gen 3 and Gen 4. Dkt. 3, ¶¶ 70-72, 101; Ex. 7. Claim 1, on which Claims 5-7 depend, requires, among other things, that "the output signal is indicative of the one or more physiological parameters." *See* '475 Patent (Ex. 1) at cl. 1.

Dr. Daft has entirely skipped this claim limitation, and does not even purport to assess it with relation to Oura's Accused Products. Thus, given the absence of this claim limitation from

[redacted]

Dr. Daft's infringement analysis, summary judgment of non-infringement of Claims 1 and 5–7 of the '475 Patent should be granted. *See Laitram,* 939 F.2d at 1535 (patentee must show any accused product meets every claim limitation); *Telemac,* 247 F.3d at 1323 ("Summary judgment of noninfringement is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial.").

**2. Dr. Daft does not analyze the "blood flow measurement" requirement of Claims 1 and 5–7 of the '475 Patent**

As established, Omni currently accuses the Oura Gen 3 and Gen 4 products of infringing Claims 1 and 5–7 of the '475 Patent. Dkt. 3, ¶¶ 70-72, 101; Ex. 7. Claim 1, on which Claims 5-7 depend, also requires, among other things, "wherein one or more physiological parameters are measured… wherein the one or more physiological parameters comprises a pulse rate monitoring *and a blood flow measurement*." *See* '475 Patent at cl. 1. Thus, according to this claim limitation, an infringing device must, *inter alia*, measure blood flow.

Dr. Daft purports to address this claim limitation at paragraphs 438-445 of his corrected report. *See* Ex. 12, ¶¶ 438-445. But in these paragraphs (and in his report overall) Dr. Daft *entirely fails to identify or even allege any blood flow measurement at all*. Instead, Dr. Daft identifies other measurements, but makes no allegations that they are blood flow measurements (and they are not). *Id.* For example, for the Gen 4 products, Dr. Daft discusses temperature, heart rate, and SpO2 as parameters that are measured, without any discussion of blood flow. *Id.*, ¶ 441. For Gen 3, Dr. Daft points only to [redacted], again without any discussion of blood flow. *Id.*, ¶ 443.

[redacted]

Critically, Dr. Daft (1) never once mentions "blood flow" in his corrected report (besides reciting claim language), and certainly never analyzes this claim requirement; (2) identifies no evidence that any Oura product measures blood flow; and (3) provides no analysis of how any of the parameters he does identify (temperature, heart rate, SpO2, PPG, HRV, [redacted], or VO2 max) could possibly be a "blood flow measurement." Bare conclusory statements that claim language is met are insufficient to create a dispute of fact. *See Intellectual Science*, 589 F.3d at 1184-87.

Indeed, there can be no material dispute that measurements of temperature, heart rate, SpO2, PPG, HRV, [redacted], or VO2 max are not measurements of blood flow. Dr. Daft has not alleged that they are, and Dr. Sarrafzadeh has confirmed that they are not in uncontested testimony. *See* Ex. 16 (Sarrafzadeh Rep.), ¶¶ 71, 73 (addressing each of these measurements in turn). A blood flow measurement must measure the flow of blood, which is to say it must "quantify[] the movement and perfusion of blood." *Id.*, ¶ 72; *see also* Ex. 18 (Deposition Transcript of Dr. Majid Sarrafzadeh), at 44:6-45:4 (distinguishing PPG measurements, which measure "pulsatile changes in blood in microvascular bed of tissue" and are therefore at best "*related to* changes in the blood flow," from "a measurement of the blood flow themself").

Because a "blood flow measurement" is a required limitation of Claim 1, and because Claims 5-7 each depend from Claim 1, the failure of any Oura product to meet this limitation is dispositive for these claims. *See Laitram,* 939 F.2d at 1535; *Telemac,* 247 F.3d at 1323. Given Omni's failure to address this claim language at all, there is no genuine dispute of material fact. Oura respectfully requests that the Court grant summary judgment of non-infringement of Claims 1 and 5–7 of the '475 Patent as to all Accused Products for this reason as well.

[redacted]

### 3. Dr. Daft does not analyze the full "third output signal" requirement of Claims 8 and 11–13 of the '475 Patent

Omni has accused all Oura products of infringing Claims 8 and 11–13 of the '475 Patent, although Omni's contentions have since been narrowed to the Oura Gen 3 and Gen 4. Dkt. 3, ¶¶ 70-72, 101; Ex. 7. Claim 8 (on which Claims 11-13 depend) sets forth at least two requirements for the third output signal: it must be generated "using at least a portion of the first output signal and at least a portion of the second output signal," and it must "be[] associated with a physiological parameter of the user." *See* '475 Patent, Claim 8.

Dr. Daft does not identify any particular signal that is both "associated with a physiological parameter of the user" *__and__* generated "using at least a portion of the first output signal and at least a portion of the second output signal"—instead, he addresses these limitations independently.

More specifically, Dr. Daft identifies the supposed "third output signal" at paragraphs 566–587 of his report, in which he states that [redacted] creates a "third output signal." *See* Ex. 16, ¶¶ 566–587. But when it comes to the claim requirement of "third output signal being associated with a physiological parameter of the user," Dr. Daft identifies physiological parameters that are measured, *__but does not tie any physiological parameters to the "third signal" he identifies__*. *See id.*, ¶¶ 438-445 (at best identifying (a) temperature, heart rate, and SpO2 for the Gen 4 and (b) [redacted]).

Thus, Dr. Daft fails to address the full requirements of Claim 8 (and therefore Claims 11-13) of the '475 Patent. Dr. Daft does not identify, let alone show, any association between [redacted] and any physiological parameter of the user. In

[redacted]

sum, Dr. Daft identifies a potential "third output signal" in one section and discusses physiological parameters in another, but never connects the two, as the claim requires.

Because Dr. Daft has failed to identify any "third output signal" that satisfies all claim requirements, Dr. Daft cannot carry his burden to show infringement of Claims 8, 11, 12, and 13 of the '475 Patent. *See Intellectual Science*, 589 F.3d at 1184-87 (expert "must specifically identify the infringing features" and the reasons "one of skill in the art would recognize them as infringing"); *Telemac*, 247 F.3d at 1323. Oura thus respectfully requests that the Court grant summary judgment of non-infringement of Claims 8 and 11–13 of the '475 Patent as to the Oura Gen 3 and Gen 4 products.

#### 4. Dr. Daft does not analyze the "status of the user" requirement of Claims 7 and 9 of the '868 Patent

Omni has accused all Oura products of infringing Claims 7 and 9 of the '868 Patent, although Omni's contentions have since been narrowed to exclude the Oura Gen 1. Dkt. 3, ¶¶ 70-72, 74; Ex. 7. Claim 7 (on which Claim 9 depends) requires, among other things, that "control logic at the host [processes] at least the portion of the wireless data *to generate a status of the user*." '868 Patent (Ex. 2), Claim 7 (emphasis added).

Dr. Daft purports to address this limitation at paragraphs 625-39 of his report. *See* Ex. 12, ¶¶ 625-639. But while Dr. Daft identifies "clouds and remote hosts" as the supposed "host" for this limitation (although only for Gen 4) (*id.*, ¶ 627) and identifies Oura's Chronotype and VO2 Max features as potential control logic [redacted] he does not address the requirement that the control logic generates a status of a user—indeed, this language is entirely absent from his analysis. *See, e.g.*, Ex. 12, ¶ 628. This absence of analysis is fatal to Omni's infringement theory, given its burden of proof. *See Intellectual Science*, 589 F.3d at 1184-87

[redacted]

(citation to technical document without "pinpoint[ing] where [the infringing] elements are found in the accused devices" is insufficient to raise a genuine issue of material fact).

As Dr. Sarrafzadeh explains in unrebutted testimony, "a 'status of the user,' by its plain and ordinary meaning, refers to the user's current state, such as 'the current state of any number of the patient's physiological parameters.'" Ex. 16, ¶ 133 (quoting '868 Patent at 7:66-8:2, 8:26-28). But there is no reason—and Dr. Daft provides none—that either Chronotype or VO2 Max is a "status" (even if Dr. Daft were to have a different understanding of "status"). The requirement is simply unaddressed.

Chronotype is an assessment of a person's broad sleep type: it is "another way of saying if you're a morning person, a night person, or somewhere in between [and] Oura divides chronotypes into six types." Ex. 14, OURA_0421410 at 411-413; *see also* Ex. 16, ¶ 135 ("chronotype [is] a behavioral classification more akin to a personality trait or a demographic descriptor than a health assessment"). Furthermore, the undisputed evidence establishes that Oura's chronotype assessment [redacted] as the claim language requires ("control logic at the host to process at least the portion of the wireless data to generate a status of the user" wherein "the wireless data compris[es] at least a part of the physiological information," which in turn traces back to a "light source" measurement)—it is instead based upon [redacted]. Ex. 13 (Patel Tr.), at 22:8-22; Ex. 15 (Declaration of Ketan Patel), ¶¶ 8-9; Ex. 14, at OURA_0421411-413; *see also* Ex. 16, ¶ 136. Thus, the Chronotype function cannot generate the claimed "status of the user" requirement of the claims.

Oura's VO2 Max evaluation, which measures "the maximum amount of oxygen an individual can utilize during intense, exhaustive exercise," Ex. 17, OURA_0421414 at 414, also

[redacted]

does not reflect any status of a user—instead, it is "a long-term fitness score." Ex. 16, ¶¶ 137-138. This assessment "will not change to reflect the current status of a user, and does not reflect any current physiological parameter." *Id.* Separately, Dr. Daft also entirely fails to analyze how the VO2 Max calculation may, or may not, relate back to any wireless data comprising physiological information obtained from the light sensors. Thus, the VO2 Max function also cannot generate the claimed "status of the user" requirement of the claims.

In short, Dr. Daft makes critical omissions in his analysis of the claim language, and entirely skips the claim requirement that the control logic generates "a status of the user." Lacking any required analysis by Dr. Daft, there can be no genuine dispute of material fact. *See Telemac,* 247 F.3d at 1323; *Adaptix,* No. 6-12-cv-00017, Dkt. 392 at 8-9 (attorney argument alone "is not enough to defeat [a defendant's] summary judgment motion"). Oura respectfully requests that the Court grant summary judgment of non-infringement of Claims 7 and 9 of the '868 Patent as to all Accused Products.

**5. Dr. Daft does not analyze the "configured to apply a threshold function to a comparison with a stored data set" requirement of Claims 12 and 13 of the '304 Patent**

Omni has accused all Oura products of infringing Claims 12 and 13 of the '304 Patent, although Omni's contentions have since been narrowed to the Oura Gen 3 and Gen 4. Dkt. 3, ¶¶ 70-72, 89; Ex. 7. Claim 12 (on which Claim 13 depends) requires, among other things, that the measurement system be "configured to apply a threshold function to a comparison with a stored data set." '304 Patent, Claim 12.

While Dr. Daft purports to address this claim limitation in paragraphs 640-49 of his report, Dr. Daft does not actually identify or allege any "threshold function" that is compared with a stored data set—this limitation, including the claim term "threshold function," is entirely skipped in his analysis. *See* Ex. 12, ¶¶ 640-649.

[redacted]

While Dr. Daft does mention certain functions in this section of his report—[redacted] (*id.* at 643-47)—he only alleges that [redacted] *See id.*, ¶ 646. This appears to be Dr. Daft's only recognition of the claim language that requires that the threshold function—again, the requirement of a threshold function is not addressed—must be applied to a stored data set.

Thus, Dr. Daft's analysis is deficient for not addressing the "threshold function" requirement. Dr. Daft also has no factual basis for his assertion that [redacted] *Id.*, ¶ 646. Rather, the undisputed evidence shows that [redacted]. *See* Ex. 16, ¶ 184 ("A stored data set is a set of data, not a machine learning algorithm, which would be an algorithm not data… [redacted]). Thus, even the [redacted] does not amount to any comparison with a historical data set by the accused Oura products, even according to Dr. Daft's allegations.

There is no genuine dispute of material fact—Dr. Daft identifies no "threshold function," and [redacted] *See Intellectual Science,* 589 F.3d at 1184-87; *Telemac,* 247 F.3d at 1323. Oura thus respectfully requests that the Court grant summary judgment of non-infringement of Claims 12 and 13 of the '304 Patent as to all Accused Products.

[redacted]

### B. Summary Judgment of Non-Infringement Should Be Granted for Specific Products Unaddressed by Dr. Daft with Regard to Claims 7 and 9 of the '868 Patent

Omni has nominally accused all Oura products, including the Oura Ring Generations 2 and 3, of infringing Claims 7 and 9 of the '868 Patent. Dkt. 3, ¶¶ 70-72, 74.[2] Claim 7 (on which Claim 9 depends) requires, among other things, "control logic at the host to process at least the portion of the wireless data to generate a status of the user." '868 Patent, Claim 7.

Dr. Daft purports to address this limitation at paragraphs 625-39 of his report, but makes no allegations whatsoever with respect to the Oura Gen 2 and 3 products—his entire analysis is directed to the "Oura Ring Gen 4," which is allegedly [redacted] *See* Ex. 12, ¶¶ 625-639. Beyond making no analysis of the functionality of the Oura Gen 2 and 3 products with respect to this claim limitation, Dr. Daft cites no evidence for the Oura Gen 2 and 3 products. *Id.*

Without any product-specific analysis, Omni cannot carry its burden of demonstrating that the Oura Ring Generations 2 and 3 meet each and every limitation of Claims 7 and 9 of the '868 Patent. *See Laitram*, 939 F.2d at 1535; *Telemac*, 247 F.3d at 1323 (summary judgment appropriate where proof deficient on essential element). Oura respectfully requests that the Court grant summary judgment of non-infringement of Claims 7 and 9 of the '868 Patent as to the Oura Ring Generations 2 and 3.

### C. Summary Judgment of Non-Infringement Should Be Granted Where the Accused Oura Products Plainly Do Not Meet Claim Limitations

For other limitations of certain claims of the Asserted Patents, Dr. Daft's analysis rests upon factual statements or assumptions that are demonstrably untrue. Where an expert opinion is

[2] Omni has since confirmed that it is not pursuing infringement by the Oura Ring Generation 1.

[redacted]

unsupported or contradicted by evidence, a mere conclusion of infringement does not establish a dispute of experts or preclude summary judgment. *See Invitrogen*, 429 F.3d at 1080.

#### 1. The Oura Ring Generation 3 does not [redacted] as required by Claims 1, 5–8, and 11–13 of the '475 Patent

Omni has accused the Oura Ring Generation 3[3] of infringing Claims 1, 5–8, and 11–13 of the '475 Patent. Dkt. 3, ¶¶ 70-72, 101. Claims 1 and 8 each require, *inter alia*, that the apparatus or wearable device be configured to "determine, based at least in part on the [third] output signal, that the [apparatus / wearable device] is being worn by the user." '475 Patent, Claims 1 & 8. Additionally, the "output signal" must be "indicative of the one or more physiological parameters" (Claim 1) or else "associated with a physiological parameter of the user" (Claim 8).

For Claim 8, Dr. Daft does not actually identify any particular "third output signal being associated with a physiological parameter of the user"—in paragraphs 438-45, where he purports to address this claim language, he only states that [redacted] but no third output signal for either the Oura Gen 3 or 4 is identified, and no physiological parameters for the Oura Gen 3 are identified at all. *See* Ex. 12, ¶¶ 441-443. This omission of identifying a particular signal alone is sufficient for summary judgment of no infringement of Claims 8 and 11-13. But at absolute best, it may be inferred that Dr. Daft alleges that the unspecified third output signal for Claim 8 is associated with [redacted].

Turning to the separate claim requirement to "determine, based at least in part on the third output signal, that the wearable device is being worn by the user," Dr. Daft implicitly identifies

[3] And the Gen 4, but the Gen 4 is not at issue in this ground for noninfringement.

[redacted]

two types of signals ([redacted]), but there are critical problems with each with respect to the Oura Gen 3 product. ***First***, regarding Dr. Daft's allegations relating to [redacted] (Ex. 12, ¶¶ 616-617), the associated signal has nothing to do with any physiological parameter, and Dr. Daft does not allege that it does. [redacted]

[redacted]

Ex. 11, OURA_0418939 at 943; *see also* Ex. 16, ¶ 91, 93 ([redacted]). No connection between this process and any physiological parameter ([redacted]) is even alleged by Dr. Daft; thus, this potential "third output signal" cannot satisfy all claim language.

***Second***, regarding Dr. Daft's allegations that the [redacted] (Ex. 12, ¶ 618), [redacted]

[redacted]

[redacted] *See* Ex. 16, ¶ 95. Furthermore, Oura's technical documents are beyond clear that, [redacted]

[redacted]

Ex. 11, OURA_0418939 at 943 ([redacted]).

Thus, the potential third output signals identified by Dr. Daft are either not associated with any physiological parameters or not implemented on the Oura Gen 3, and non-infringement of the Oura Gen 3 should be granted in either instance.

For Claim 1, there are again several issues with Dr. Daft's analysis. First, as addressed above in Section V.A.1, Dr. Daft has not addressed the limitation that "the output signal is indicative of the one or more physiological parameters." This alone should be dispositive for noninfringement. Additionally, Dr. Daft alleges that the same paragraphs (617-19 and 623) of his report address the Claim 1 requirement to "determine, based at least in part on the output signal, that the apparatus is being worn by the user." *See* Ex. 12, ¶¶ 617-619. For the reasons explained above, for the Oura Gen 3, the potential output signals identified by Dr. Daft ([redacted]

[redacted]

[redacted]) are either not associated with any physiological parameters ([redacted]) or not implemented on the Oura Gen 3 ([redacted]), and non-infringement of the Oura Gen 3 should be granted in either instance.

Thus, Oura respectfully requests that the Court grant summary judgment of non-infringement of Claims 1, 5–8, and 11–13 of the '475 Patent as to the Oura Ring Generation 3.

### 2. The Oura Ring Generation 3 does not have six LEDs as required by Claim 6 of the '475 Patent

Omni has accused the Oura Ring Generation 3[4] of infringing Claim 6 of the '475 Patent. Dkt. 3, ¶¶ 70-72, 101. Claim 6 requires "wherein the plurality of light emitting diodes comprises six light emitting diodes." '475 Patent, Claim 6.

The uncontroverted evidence affirmatively establishes that the Oura Ring Generation 3 does not have six LEDs; [redacted]. Ex. 8, OURA_0003395 at 413-414; Ex. 9, OURA_0000022. Indeed, Dr. Daft *himself* recognizes this, as he states that the [redacted] Ex. 12, ¶ 459.

Given that the undisputed evidence, recognized by Omni's own expert, shows that the Oura Gen 3 [redacted], the Gen 3 cannot possibly meet the requirements of Claim 6 of the '475 Patent. Summary judgment of noninfringement should be granted. Dr. Daft's unsupported conclusion—contradicted by his own analysis—does not generate a genuine issue of material fact. Oura therefore respectfully requests that the Court grant summary judgment of non-infringement of Claim 6 of the '475 Patent as to the Oura Ring Generation 3.

[4] And the Gen 4, but the Gen 4 is not at issue in this ground for noninfringement.

[redacted]

### 3. No Oura ring contains "a plurality of lenses" as required by Claim 12 of the '533 Patent

Omni has accused all Oura products of infringing Claim 12 of the '533 Patent (which depends on unasserted Claim 5), although Omni's contentions have since been narrowed to just the Oura Gen 4. Dkt. 3, ¶¶ 70-72, 74; Ex. 7. Claim 5 requires "an apparatus comprising a plurality of lenses configured to receive a portion of the output optical beam and to deliver an analysis output beam to a sample." '533 Patent, Claim 5. Furthermore, the parties' agreed claim construction requires that a "beam" is "photons or light transmitted to a particular location in space." Ex. 19 (Joint Claim Construction Chart (Dkt. 122)), at 1-2. Thus, to satisfy this claim language, there must be a "plurality of lenses" that are "lenses configured to receive a portion of the output optical beam," wherein the beam is "photons or light transmitted to a particular location in space."

Dr. Daft purports to address this claim limitation at paragraphs 476-85, and points to what he alleges are multiple lenses for the Oura Gen 4. *See* Ex. 12, ¶ 479. [redacted]

[redacted]

*Id.*, ¶ 479. Thus, Dr. Daft is advancing a critically flawed infringement theory, because even if the components to which Dr. Daft points are lenses, [redacted]

[redacted]. This does not satisfy the claim language of "a plurality of lenses configured to receive a portion of the output optical beam":

[redacted]

Ex. 16, ¶ 162 [redacted].

[redacted]. Ex. 12, ¶¶ 476-85; Ex. 16, ¶¶ 157–163. Thus, there can be no genuine dispute of material fact as to infringement. *See Cummins-Allison*, 2005 WL 3408029, at *2 ("the absence of a single claim limitation from the accused product precludes literal infringement"); *PC Connector Solutions*, 406 F.3d at 1364. Oura respectfully requests that the Court grant summary judgment of non-infringement of Claim 12 of the '533 Patent.

[redacted]

### D. Summary Judgment of No Direct Infringement of the ’868, ’533, and ’304 Patents Should Be Granted

The asserted claims of the ’868, ’533, and ’304 Patents are each “system” claims, where the system requires, generally: ***(1) a sensing device*** (specifically, the “light source” of the ’868 Patent independent Claim 7; the “light source”/“apparatus”/“receiver” of the ’533 Patent independent Claim 5; and the “wearable measurement device” of the ’304 Patent independent Claim 11); ***(2) a phone*** (specifically, the “control system having a touch-screen” of the ’868 Patent independent Claim 7; the “personal device” of the ’533 Patent independent Claim 5; and the “smart phone or tablet” of the ’304 Patent independent Claim 11); ***and (3) a cloud*** (specifically, the “host” of the ’868 Patent independent Claim 7; the “remote device” of the ’533 Patent independent Claim 5; and the “cloud” of the ’304 Patent independent Claim 11); *see also* Ex. 16, ¶ 197 (“the Asserted Claims of these patents are ‘system claims’ that require (speaking at a high level) a sensing device, a phone, and a cloud”). Indeed, for these patents, Dr. Daft focuses on what he calls the “Oura System,” where this system includes an Oura ring, the Oura app operating on a phone, and the Oura cloud. *See, e.g.*, Ex. 12, ¶ 423.

But because Oura does not sell “systems” (it instead sells rings), Omni’s theories of infringement for these patents (collectively, the “System Patents”) rely upon *usage* of the full claimed system to satisfy the “makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention” requirement of direct infringement. *See* 35 U.S.C. § 271(a).

More specifically, Omni has two theories of direct infringement: (1) end users of the Oura rings “use” the “systems claimed in the Asserted Patents by wearing an Oura ring on a finger” (*see* Ex. 12, ¶¶ 1535-1537), and (2) “Oura provides its rings to its employees in the United States to

[redacted]

use [and] conducts research in the United States 'for its own use,' where it provides its rings for research purposes" (*id.*, ¶¶ 1521-1522).

Both theories of direct infringement fail as a matter of law.

**1. There can be no direct infringement by end users of the "Oura System" because the Oura Cloud [redacted] and not controlled by end users**

First, Omni is incorrect that any end user "uses" what Dr. Daft terms the "Oura System" in the United States according to the requirements of 35 U.S.C. § 271(a). "To 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it." *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (quoting *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)). Omni has provided absolutely no evidence of end users controlling "the system as a whole" in the United States.

In fact, the undisputed evidence shows the opposite: as *experts from both parties agree*, the end user does not actually control operations of the entire (in Dr. Daft's words) "Oura System," as they do not control the Oura cloud:

[redacted]

Ex. 16 (Sarrafzadeh Rep.), ¶¶ 211-212 (emphasis added).

[redacted]

[redacted]

[redacted]

[redacted]

Ex. 20 (May 6, 2026, Deposition Transcript of Dr. Christopher Daft), 161:17-162:3 (emphasis added).

There is no evidence showing *any* control by any end user of the entire "Oura System," including the Oura Cloud [redacted]. And outside of the deposition testimony cited above, Dr. Daft provides no opinions on this matter at all. Therefore, for the particular Oura system being accused, there is no use of the entire accused system by end users in the United States. There can therefore be no direct infringement of the asserted claims of the '868, '533, and '304 Patents according to Omni's end-user theory.

**2. Dr. Daft did not link any alleged employee testing to the use of the entire claimed systems of the '868, '533, and '304 Patents**

Dr. Daft's alternative, two-sentence theory of direct infringement is that "Oura provides its rings to its employees in the United States to use [and] conducts research in the United States 'for its own use,' where it provides its rings for research purposes." Ex. 12, ¶¶ 1521-1522. But this too cannot sustain direct infringement as a matter of law.

To begin with, mere testing of any sort does not establish usage of the claimed "Oura System"—[redacted]. Usage of the claimed systems requires much more:

- Direct infringement for all asserted claims of the '868 Patent—even according to Dr. Daft's theories—requires at a minimum use of Oura's cloud services and either Oura's chronotype or VO2 max calculations and machine learning models.
- Direct infringement for all asserted claims of the '533 Patent—even according to Dr. Daft's theories—requires at a minimum use of Oura's cloud services.

[redacted]

- Direct infringement for all asserted claims of the '304 Patent—even according to Dr. Daft's theories—requires at a minimum use of Oura's cloud services and "apply[ing] a threshold function to a comparison with a stored data set."

*See* Ex. 16, ¶ 204 ("Dr. Daft has not demonstrated what any such alleged testing or research entailed, nor has he made any comparison of any such activities with the claims of the '868, '533, or '304 Patents"). Indeed, a comparison would need to be made between any alleged testing and *all* of the requirements of the asserted claims of the System Patents, and none has been made.

Thus, the following deficiencies regarding Dr. Daft's testing theory are common to all three patents: (1) he has not shown what any alleged testing or research actually entailed—he provides no detail about the nature, scope, or methodology of any testing conducted by Oura employees; (2) he has not shown that any testing involved the use of Oura's cloud services, even though all three patents require some form of cloud-based processing as part of the claimed system; (3) he has not quantified the scope of any alleged testing, including how many employees tested rings, how many rings were tested, how often testing occurred, or when testing occurred; and (4) he has not shown that any testing, even if it occurred, would constitute direct infringement by all devices sold to consumers. At most, the testing theory could concern only the specific devices actually used for testing, which Dr. Daft has not identified or quantified.[5] The same "control" defect also undermines this theory because there is no showing that any Oura employee testing Oura rings in the United States controls any portion of the Oura cloud.

Because Dr. Daft has failed to link any Oura testing to the use of the entire claimed system of any of the '868, '533, or '304 Patents, Omni cannot carry its burden of proof to show direct infringement on the basis of this theory. *See Telemac,* 247 F.3d at 1323; *Intellectual Science,* 589 F.3d at 1184-87. Oura respectfully requests that the Court grant summary judgment of no direct

[5] Omni's damages expert, Mr. Chander, puts forth no damages theory tied to alleged testing by Oura.

[redacted]

infringement of Claims 7 and 9 of the ’868 Patent, Claim 12 of the ’533 Patent, and Claims 12 and 13 of the ’304 Patent based on Oura’s testing activities.

## VI. CONCLUSION

For the foregoing reasons, Oura respectfully requests that the Court grant summary judgment of non-infringement on each of the grounds set forth above. The undisputed record establishes that Dr. Daft failed to address required claim limitations, failed to provide product-specific analyses, relied on features that do not exist in the Accused Products, and offered no legally sufficient basis for direct infringement of the System Patents. No reasonable jury could find infringement on this record.

[redacted]

Dated: May 14, 2026

Respectfully submitted,

*/s/ Jasjit S. Vidwan*

James A. Fussell, III
Jasjit S. Vidwan
Michael L. Lindinger
Tiffany A. Miller
Clark S. Bakewell
Julia Haines
Amanda E. Stephenson
Matthew Stanford
Angeline L. Premraj
Paul Choi
**MAYER BROWN LLP**
1999 K Street, NW
Washington, DC 20006-1101
Tel: 202-263-3000
jfussell@mayerbrown.com
jvidwan@mayerbrown.com
mlindinger@mayerbrown.com
tmiller@mayerbrown.com
cbakewell@mayerbrown.com
jhaines@mayerbrown.com
astephenson@mayerbrown.com
mstanford@mayerbrown.com
apremraj@mayerbrown.com
pchoi@mayerbrown.com
Oura-Omni@mayerbrown.com

Robert G. Pluta
Nicholas H. Ciulla
**MAYER BROWN LLP**
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-701-8641
rpluta@mayerbrown.com
nciulla@mayerbrown.com
Oura-Omni@mayerbrown.com

Shaun William Hassett
SBN: 24074372
**POTTER MINTON, PC**
102 North College, Suite 900
Tyler, TX 75702
Tel: 903-525-2272
shaunhassett@potterminton.com

[redacted]

*Counsel for Oura Health Oy*

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 14th day of May, 2026, via electronic mail.

*/s/ Clark S. Bakewell*
Clark S. Bakewell

[redacted]

[redacted]

[redacted]
[redacted]